WILLIAM B. GUILD, EXECUTOR OF HANNAH M. WILSON, DECEASED, WHO WAS DEVISEE OF DANIEL M. WILSON, DECEASED, PLAINTIFF IN ERROR, v. JOEL PARKER, RECEIVER OF NEW JERSEY MUTUAL LIFE INSURANCE COMPANY.

1. An amendment within the power of the court to allow, is not the beginning of a new action, so as to subject the suit to the operation of the statute of limitations, which was not a bar at the time of instituting the action.

2. A director of a corporation cannot make for himself or for his own benefit, a contract which will bind the company. The contract may be repudiated by the company, at the instance of any stockholder.

3. A board of directors who have made a barter of the assets of the company for personal gain, cannot, by an act purporting to be an acceptance for the company, of an equivalent for such assets, conclude the stockholders or their representatives from showing that no equivalent was actually received.

4. The doctrine of tender applies only when a person who desires to avoid a fraudulent contract has received some benefit under it which he is able to restore, and can so place the other person *in statu quo.*

---

This writ of error brings up the judgment and the exception sealed in the course of the trial of this action in the Essex Circuit.

For the plaintiff in error, *A. Q. Keasbey.*

For the defendant in error, *F. W. Stevens* and *B. Gummere*

The opinion of the court was delivered by

REED, J. The New Jersey Mutual Life Insurance Company was incorporated in 1863. It was a mutual company, as its name imports, but by section 5 of its charter, the directors were authorized to raise a guaranty capital, to be held as the board of directors might deem expedient, and for the better security of the insured.

The by-laws (section 25) provided for a guaranty capital of not less than $100,000, to stand as security for the payment of policies, in addition to the regular fund to be annually reserved for that purpose, and to be used for no other purpose whatever. Said stock shall be divided into shares of $1000 each, and shall be held upon such terms and conditions as the directors shall prescribe in the articles of subscription. If any part of said capital shall be redeemed, an equal amount shall be deposited in its place, as hereinafter provided. In case any of the guaranty capital shall be redeemed, other funds of the company equal in amount to the capital so redeemed, shall be deposited in its place, and shall always be held exclusive of the reserve fund, for the better security of the insured.

The articles of subscription contained this stipulation: "It is understood and stipulated that the capital shall be held sacred for the security of the policy-holders, and for that and no other purpose whatever."

Daniel M. Wilson became a subscriber to these articles, for ten shares of the guaranty capital, amounting to the sum of $10,000. Daniel M. Wilson also became a director of the company in 1871, and continued such until his death, in January, 1872.

The articles of subscription provided that the stock should be entitled to a dividend of eight per cent. per annum before any dividend should be paid to the members of the company, and that, in addition to the eight per cent., the owners of this capital stock should be entitled to share in the net profits of the company to the extent of one-tenth of the net profits.

They also provided that the company should have the

privilege, at any time after five years, of redeeming the said stock, or any *pro rata* portion thereof, by paying to the respective owners of the same a sum of money equal to the par value of the shares, and thereupon the amount so redeemed should cease to be capital stock. This stock was assignable as personal property upon the books of the company.

The stock subscribed for upon these terms was held by Mr. Wilson until September, 1872, he receiving in the meantime, with the other holders, his annual dividends and the share of profits arising from the business.

At a meeting of stockholders held September 24th, 1872, at which Mr. Wilson was present, with twelve other directors and stockholders, letters were presented from the International Life Insurance Company of Chicago and the Hope Life Insurance Company of New York, offering to re-insure the policies and assume all the obligations of the New Jersey Mutual, and to reimburse the stockholders the amount of the guaranty capital, with fifty per cent. *bonus* thereon, payable out of the bonds and mortgages of the New Jersey Mutual.

On the same day a paper accepting the proposition, and authorizing William M. Force, president, and C. C. Lathrop, vice-president, to contract with either of the said companies, as may be found most advantageous to the policy-holders and protection of agents, was signed by sixteen of the stockholders, including all the above-named directors.

On the 28th of September, 1872, a contract was made, on the basis of the written proposition, with the Hope Mutual Life Insurance Company.

In pursuance of this agreement, bonds and mortgages of the New Jersey Mutual were paid for the guaranty capital of $100,000 to the amount of $150,000. The mortgages, however, were deposited in the hands of C. C. Lathrop, with assignments thereof duly executed by the New Jersey company to the several holders of the guaranty capital, to be held by him until the Hope company should replace them.

A meeting of the board of directors was held on November 1st, 1872, at which meeting it was resolved to strike out sec-

tion 2 of the by-laws, which provided that no person should be eligible as a director in this, if a director in any other life insurance company. At this meeting seven persons who were directors of the Hope Mutual were elected directors of the New Jersey company.

The change in the by-laws was inoperative, because no notice of the proposed amendment had been given, so far as appears; and without such notice, it required a unanimous vote of the board, while for this only thirteen out of a board of twenty voted.

On January 18th, 1872, Daniel M. Wilson died. On January 20th the annual election for directors was held, and, as I have already stated, six persons, who were already directors of the Hope Mutual, were elected directors of the New Jersey company; and John J. Anderson, who was treasurer of the Hope company, was treasurer of the New Jersey company.

On the same day, Anderson gave a receipt, as treasurer of the New Jersey company, to C. C. Lathrop, for the $150,000 of mortgages.

On the same day, Mr. Anderson took over from New York city to Newark $100,000 in checks and $50,000 in mortgages belonging to the Hope Mutual.

According to his testimony, the checks and mortgages were taken over with the understanding that they were to be used for the purpose of paying the stockholders for their stock. He stayed there, he says, and after a while Mr. Plummer said to him that they would not be wanted, and he took the checks. They had been entrusted to him by persons in New York city; and he went to New York to the parties who had given him the checks, and returned them. Whether the amount of $150,000 was actually paid into the New Jersey Mutual to replace the bonds and mortgages which were held by Lathrop, and by him assigned to the owners of the guaranty capital stock, became the material question of fact at the trial, and was found by the jury against the defendants.

The bond and mortgage to which Daniel M. Wilson was entitled, under this arrangement, seems to have reached the

hands of Hannah M. Wilson, his devisee, soon after his death.

Some were foreclosed by her as executrix, and others directly converted into money by her, she being sole executrix, legatee and devisee.

The New Jersey Mutual was decreed insolvent in 1877, and Joel Parker was appointed receiver.

He, as the representative of the company and its policy-holders, brought the present action to recover the money received from the said mortgages, upon the theory that the transaction which resulted in their assignment and delivery to Mrs. Wilson was void or voidable, and that they were still the property of the company, and the money into which they had been transmuted belonged to the company.

When the action was commenced, it was thought that the mortgages came to the hands of Mr. Wilson during his lifetime, and the declaration was framed, and the action was brought, upon that supposition.

It appeared, as we have seen, that the mortgages came into the possession of Mrs. Wilson soon after her husband's death. An amendment was ordered, so that the declaration would conform to the facts.

The counsel for the plaintiff in error insists that there should have been a nonsuit, upon the ground that no case was made under the original declaration. This means that there was no power in the court to order the amendment. But it was so clearly within the discretion of the court, that the facts alone are sufficient answer to this objection.

It is next urged that there should have been a nonsuit, upon the ground that the amendment was a new suit, and so was barred by the statute of limitations, which had been pleaded to the original declaration.

But the amendment was made because the cases, as stated originally and as amended, were formally different but substantially identical. Otherwise, it would not have been an amendment, but a substitution of one cause for another substantially different, and beyond the power of the trial judge there or this court here to make.

The meritorious question is whether any action lies against the executor of Mrs. Wilson for the recovery of this money.

I think it must be at once admitted that if it appeared as a fact in the case that the mortgages passed into her possession in pursuance of the action of the board of directors, at the meeting of November 24th, 1872, and the contract subsequent thereto, that she got no title which will support her claim to them, as against the right of the members of the New Jersey company. The charge of the trial judge was to that effect. A director of a corporation cannot make for himself, or for his own benefit, a contract that will bind the company. The contract may be repudiated by the company, at the instance of a stockholder. *Field on Corp.*, § 175; *Green's Brice's Ultra Vires* (2d Am. ed.) 477, note *a;* 479, note *a.*

The above transaction falls directly within the operation of this rule.

It was an arrangement made by directors who, by virtue of their position, were trustees for the members of the corporation. By the arrangement, they received for such stock as they held, mortgages to the amount of its par value, and an additional *bonus* of fifty per cent. ; and the mortgages which they received for such stock constituted a part of the assets of the company.

But the plaintiffs in error insist that the following case was made, namely, that the real arrangement was merely to effect a sale of the stock, held by the owners thereof, to certain persons who wished to take such owners' place as stockholders and directors; that instead of paying for such stock directly, they were to pay the amount of the consideration for the purchase into the treasury of the New Jersey company, and the New Jersey company was to pass over to the vendors an equal amount of their mortgages.

This, if carried out, would have left the financial condition of the company unchanged.

The trial judge charged that if it should appear, as the result of the testimony, that the $150,000 in money, not by pretext, but actually, came into the coffers of the company, and the com-

pany received the benefit of it, then, as against the defendant, that consideration would support the transfer of assets to her, and although it should appear that the organization of the company perfected on January 20th was designed to carry out the illegal contract witnessed by the written evidence in the cause.

The jury found against the fact of the actual reception of the amount by the company.

The plaintiff in error insists that the act of the board on the 20th of March was an acceptance, or an admission of acceptance, of the amount, and that the charge that there must have been an actual transfer of the money, and reception of the benefit thereof, was erroneous.

The charge was obviously correct. The defence was presented in the nature of a counter-claim, for a *quantum meruit* for money paid to the company for their benefit. There was no power in the board, after allowing the use of the mortgages, to conclude the company from saying that the money had not been received, when in fact they had not received any benefit from it.

The plaintiff contends, also, that Mrs. Wilson was not a party to any fraudulent act, that she is an innocent holder of the mortgages, and that the charge of the court, that if Mrs. Wilson seeks to make title under the transaction subsequent to the death of her husband, she must defend the legality of the proceedings of June 20th, 1873.

But it was not a sale to her of assets of the company, for which she paid value. She was, upon the death of her husband, the holder of his stock, and the delivery was made to her as the holder of her husband's rights under the original contract. It was not a redemption of the stock, in pursuance of the articles of subscription, but a transfer to her of assets of the company, in accordance with the agreement. If the transfer was illegal and voidable, she was bound to re-deliver the assets or their proceeds as her husband would have been had he received the mortgages or their proceeds. She does not occupy the position of a purchaser for value without notice.

It is also contended by the plaintiffs in error that there should have been a tender, by the receiver, of the certificates of stock to Mrs. Wilson, before bringing this action. The rule undoubtedly is that the party who would recover back, on the ground of fraud, what he had parted with under a contract, must, before bringing suit, offer to return whatever he has received under the contract, and which he is able to return. *Byard* v. *Holmes*, 4 *Vroom* 119.

The rule only means that the party must restore what he himself has received, and, by force of the contract, has under his own control. *Hammond* v. *Pennock*, 61 *N. Y.* 153.

But the receiver, as representative of the stockholders and creditors of the corporation, does not hold the certificates of stock by virtue of the contract entered into between the directors and Mr. or Mrs. Wilson; and as between the receiver, representing the *cestui que trust*, and a third person who has got possession of the assets of the company by a voidable contract with the trustee, the rule of tender does not apply.

Otherwise, the inability to make a tender of what was not within the possession of the *cestui que trust*, would often prevent an action to recover property misappropriated by the trustee. Besides, the stock itself, immediately upon the rescission, becomes hers again, and she can pursue it into the hands of those claiming to own it.

Nor do I think that the contention that there should have been a rescission within a reasonable time and the action brought within it, can be urged against the judgment.

The property was that of the *cestui que trust*, and each one of the stockholders had the right to follow it within the statutory period. Within that period this action was brought by their representative, the receiver. Again, whenever the plaintiff's knowledge of the fraud, and his neglect to promptly respond, is relied upon to defeat the action, the burden of proving such knowledge and the time when it was acquired rests upon the defendant. *Pence* v. *Langdon*, 99 *U. S.* 578.

No attempt was made in this case to prove such facts, nor do I see how it would have been possible to prove them, as

to all the persons interested, before the appointment of the receiver, or of the receiver as their representative thereafter.

I find no error in the bill of exceptions, and think the judgment should be affirmed.

*For affirmance*—THE CHIEF JUSTICE, DIXON, REED, SCUDDER, VAN SYCKEL, CLEMENT, COLE, DODD, GREEN.    9.

*For reversal*—None.